UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF ISRAEL RAMIREZ LUNA | Case No. 16-xr-90095 NC<br><br>**ORDER GRANTING CERTIFICATE OF EXTRADITION AND DENYING MOTION TO DENY EXTRADITION**<br><br>Re: Dkt. Nos. 1, 52 |

The United States, on behalf of the Government of Mexico, seeks to extradite Israel Ramirez Luna for a 2009 murder that occurred in Mexico. Before the Court are the government's motion for certification of extradition and Ramirez Luna's motion to deny the extradition request. The extradition request is made pursuant to the extradition treaty in full force and effect between the United States and Mexico. Under 18 U.S.C. § 3184, for the reasons stated below, the Court GRANTS the certificate of extraditability, certifying to the United States Secretary of State that there is sufficient evidence to sustain the charge of aggravated homicide against Ramirez Luna under the governing extradition treaty. The Court also DENIES Ramirez Luna's motion to deny extradition for lack of probable cause.

Case No. 16-xr-90095 NC

## I. BACKGROUND

### A. Events Leading Up To Ramirez Luna's Arrest

According to the complaint for Ramirez Luna's provisional arrest, on January 4, 2009, Ramirez Luna was at a party in the town of Santa Tomas Huatzindeo in the state of Guanajuato. Dkt. No. 1 at 2. Ramirez Luna, and the victim, Omar Garcia, began to fight one another outside the club where the party was held. *Id*. The parties were separated, but Ramirez Luna later returned to the parking lot holding a machete, and his brother Mauricio Ramirez Luna came brandishing a firearm. *Id*. Immediately prior, Garcia was about to leave the party with Rodolfo Villegas Villafuerte, who was driving out of the parking lot. *Id*. at 2-3. Mauricio shot Rodolfo, and Omar approached the truck. *Id*. at 3. *Id*. Omar then ran, but Mauricio shot him when he attempted to escape. *Id*. Mexico alleges that after this, Ramirez Luna "stabbed Omar Garcia twice in the neck with a machete, killing him." *Id*. Ramirez Luna does not contest that probable cause exists to support that he "approached Mr. Garcia and cut his neck with a machete," but does contest that probable cause exists that the blow killed him. Dkt. No. 52 at 4.

Two eyewitnesses identified Ramirez Luna as the man who fought with Omar and stabbed him. Dkt. No. 1 at 3. As a result, Luna was charged in Guanajuato with two counts of "aggravated homicide." *Id*. at 2. A Mexican judge issued an arrest warrant for Ramirez Luna on May 8, 2009. *Id*.; *see also* Mexican Extradition Documents Bates Stamp Number (BSN) 55-85.

### B. The Provisional Arrest and Bail Hearing of Ramirez Luna

The United States filed a complaint for the provisional arrest of Ramirez Luna with a view towards extradition on February 8, 2016. Dkt. No. 1. Ramirez Luna was arrested and initially appeared before the Court on February 12, 2016. Dkt. No. 2. The Court granted Ramirez Luna's request for bail on April 7, 2016, finding that he established "special circumstances" for release. Dkt. No. 20. Ramirez Luna remains out of custody, subject to a combination of release conditions, including electronic location monitoring.

*Id.*

### C. Subsequent Procedural History

The United States submitted the formal extradition documents in support of extradition on May 10, 2016. Dkt. No. 27. Ramirez Luna previously filed a motion to dismiss his case, alleging his extradition was time-barred under Article 7 of the Mexico-United States Extradition Treaty of 1978. Dkt. No. 41. The Court denied the motion to dismiss. Dkt. No. 51. The government moves for certification, and Ramirez Luna also moves to deny extradition for lack of probable cause, because he argues that while the government has presented probable cause that "he cut Omar Garcia's neck with a machete on the night Mr. Garcia was killed, the government has failed to establish probable cause to believe that this injury is what caused Mr. Garcia's death." Dkt. No. 52 at 4. The Court held a hearing on certification and the motion to deny extradition on February 22, 2017. Dkt. No. 55.

## II. LEGAL STANDARD

Extradition is initiated by a request from the nation seeking extradition directly to the United States Department of State. The State Department reviews whether the request is "within the scope of the relevant extradition treaty," and if so, a United States Attorney "files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005) (citations and quotation marks omitted.) Title 18 U.S.C. § 3184 governs the extradition process from the United States, providing that any "judge of the United States, or any magistrate judge authorized so to do by a court of the United States," may conduct an extradition hearing under the extradition treaty between the requesting country and the United States and issue a certificate of extraditability to the Secretary of State. The extraditing court's role in these proceedings is limited, and "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006).

To certify an extradition, a Court must find that:

> 1. the extradition judge had jurisdiction to conduct proceedings;
>
> 2. the extradition court had jurisdiction over the fugitive;
>
> 3. the extradition treaty was in full force and effect;
>
> 4. the crime fell within the terms of the treaty; and
>
> 5. there was competent legal evidence to support a finding of extraditability.

*Zanazanian v. United States*, 729 F.2d 624, 625-26 (9th Cir. 1984); *In re Extradition of Trinidad*, 754 F. Supp. 2d 1075, 1079 (N.D. Cal. 2010) (citing 18 U.S.C. § 3184); *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000), *overruled on other grounds in*, *Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012) (footnote omitted) ("The purpose of the hearing before the magistrate or judge is to determine whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge.")).  If the judge finds both elements are met, the judge must certify the same to the Secretary of State. *Cornejo-Barreto*, 218 F.3d at 1009.  The Secretary of State makes the ultimate decision whether to extradite the accused to the requesting country. 18 U.S.C. § 3186.  "In carrying out its duties under § 3184, the extradition court liberally construes the pertinent treaty; and, 'in the interest of justice and friendly international relationships,' the treaty 'should be construed more liberally than a criminal statute or the technical requirements of criminal procedure.'" *In Matter of Extradition of Azizi*, No. 5:14-xr-90282 PSG, 2015 WL 1299791, at *5 (N.D. Cal. Mar. 20, 2015) (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933)); *In re Extradition of Gonzales*, No. 09-70576 DMR, 2012 WL 1215237, at *2 (N.D. Cal. Apr. 10, 2012).

      The judge must examine the treaty to determine if the charged offense is extraditable.  *See Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).  A judge must find probable cause to certify an extradition, and that requires the judge to determine if there is "'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the accused's guilt.'"  *In re Flores Ortiz*, No. 10-MJ-2016 JMA, 2011 WL 3441618, at *7 (S.D. Cal. Feb. 9, 2011) (*quoting United*

*States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984); *In re Extradition of Gonzales*, 2012 WL 1215237, at *2. The judge makes no determination of guilt or innocence, as the demanding country will determine the accused's guilt. *Valencia v. Limbs*, 655 F.2d 195, 198 (9th Cir. 1981).

Properly authenticated "[d]epositions, warrants, or other papers" are admissible as evidence in an extradition hearing. 18 U.S.C. § 3190 ("Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence . . . [for all purposes if they are] properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of" the country from which the accused escaped). Sworn witness statements may be used to establish probable cause. *Sainez v. Venables*, 588 F.3d 713, 717-18 (9th Cir. 2009) (citing *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986)).

The person whose extradition is sought may present evidence that "explains away or completely obliterates probable cause . . . whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999), *superseded by statute on other grounds, Santos v. Thomas*, 779 F.3d 1021, 1024 (9th Cir.), *reh'g en banc granted*, 804 F.3d 998 (9th Cir. 2015), *and on reh'g en banc*, 830 F.3d 987 (9th Cir. 2016). That person may not, "for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof." *Santos*, 830 F.3d at 993. The individual also may not "impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government." *Id.* (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)).

The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply in extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3). The admissibility of evidence is governed by the general extradition law of the United States and the provisions of the extradition treaty. *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988).

Case No. 16-xr-90095 NC            5

Further, "unless the relevant treaty provides otherwise, the only requirement for evidence is that it has been authenticated." *Manta v. Chertoff*, 518 F.3d 1134, 1146 (9th Cir. 2008); *see also In Matter of Extradition of Azizi*, 2015 WL 1299791, at *5.

## III.  DISCUSSION

### A.  The Court Has Jurisdiction to Conduct Extradition Proceedings.

Under 18 U.S.C. § 3184 and Criminal Local Rule 7-1(b)(13) (specifically permitting magistrate judges to conduct extradition hearings), the Court has jurisdiction to preside over Ramirez Luna's extradition. *Ward v. Rutherford*, 921 F.2d 286, 289 (D.C. Cir. 1990). This issue is uncontested.

### B.  The Court Has Jurisdiction Over Ramirez Luna.

Under 18 U.S.C. § 3184, this Court has jurisdiction over Ramirez Luna, who is located under electronic location monitoring under the supervision of Pretrial Services within this district, in Willits, California, in the Northern District of California. *See* Dkt. No. 20 (Order Granting Request for Bail in Extradition Proceeding). This issue is uncontested.

### C.  The Applicable Treaty is in Full Force and Effect.

The parties do not dispute, and the Court finds, that the extradition treaty between the United States and Mexico is in full force and effect. BSN 1.

### D.  Aggravated Homicide is an Extraditable Offense.

Article 2, § 1 of the Mexico-United States Extradition Treaty defines "extraditable offenses." Treaty Signed at Mexico City May 4, 1978, 1980 WL 309106, T.I.A.S. No. 9656 (Jan. 25, 1980). Such offenses include "wilful acts," which "are punishable in accordance with the laws of both" Mexico and the United States "by deprivation of liberty the maximum of which shall not be less than one year." Treaty, art. II, § 1. The "dual criminality" requirement allows extradition "only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) (citations and quotation marks omitted). Yet the legal elements for establishing the crime need not be identical under

both nations' laws, so long as the charged conduct is substantially analogous. *Id*. at 766.

On May 8, 2009, the Mexican court issued a warrant for Ramirez Luna's arrest for the aggravated homicide of Omar Garcia. BSN 42. The court issued the warrant for aggravated homicide on the grounds that it had been committed with "unfair advantage," as defined in Articles 140 and 153 of the State of Guanajuato's criminal code. BSN 42, 91. In Mexico, the statute of limitations on the homicide will run on January 4, 2039. BSN 88. The most analogous crime is second degree murder. 18 U.S.C. § 1111(a); *see* Dkt. No. 41 at 8-9 *and also* Dkt. No. 41-2 (Pinto-Leon Declaration) (finding that because the Mexican authorities did not find Ramirez Luna acted with premeditation, he could not be charged with first degree murder). Neither the United States nor the Mexican government argue Ramirez Luna committed first degree murder. Second degree murder is punishable by more than one year of imprisonment. Treaty, art. II, § 1.

### E. Probable Cause Exists to Extradite Ramirez Luna.

Mexico presents translated[1] documentary evidence in support of extradition, including sworn statements and identifications of eyewitnesses Pablo Murillo Ramirez and Luis Angel Garcia Sanchez. The Mexican government relies on the eyewitness statements of Luis and Pablo, whose "statements coincide and are convincing upon describing what happened" the night Omar was murdered. BSN 49. Mexico also relies on sworn statements of other witnesses, whose statements are not attached as exhibits to the extradition papers, but were excerpted in the Mexican warrant. Ramirez Luna obtained these witness statements, translated them into English, and provided them to the Court in the motion to deny extradition. Dkt. No. 52. The Court also discusses the autopsy performed on Omar Garcia by the Mexican authorities, and an expert report provided by Ramirez Luna to negate probable cause.

---

[1] Though Mexico translated the documents into English, the translations are not always grammatically correct or entirely intelligible. The Court acknowledges that the translations are imperfect.

Case No. 16-xr-90095 NC             7

### 1. Witness Statements

#### a. Pablo Murillo Ramirez

Pablo gave two witness statements, in 2009 and 2012. BSN 50. On October 8, 2012, he identified Ramirez Luna from a photo array. BSN 50. Mexico provided only excerpts of Pablo's 2012 statement, and did not provide his 2009 statement. BSN 187-89. Ramirez Luna argues the Court should disregard Pablo's testimony because of inconsistencies between his first and second statements regarding how much of the events he saw, and an inaccuracy in describing Omar's machete wounds. Dkt. No. 52 at 13-14.

In the 2012 statement, Pablo stated that he went to the party and was dancing when he heard two gunshots in the street. BSN 187. He went outside and saw Mauricio holding a gun, and Omar Garcia running towards a parking lot. BSN 188. When Omar slipped, Mauricio shot him. *Id*. Pablo then saw Ramirez Luna approach Omar carrying the machete and stab him in the neck and head. *Id*. He saw Mauricio and Ramirez Luna leave the scene. *Id*.

#### b. Luis Angel Garcia Sanchez

Luis also gave two statements, in 2009 and 2012. BSN 50, 182. On October 8, 2012, he identified Ramirez Luna from a photo array. BSN 50. Ramirez Luna challenges Luis' testimony because of inconsistencies between the statements. Dkt. No. 52 at 14.

In the 2012 statement, Luis stated that he was already outside when he saw Ramirez Luna and Omar begin fighting and later be broken up. BSN 183. Luis stated he witnessed Mauricio shooting Omar, and Ramirez Luna striking Omar in the neck with the machete. *Id*. He stated that Mauricio and Ramirez Luna later walked away from the scene. *Id*. Luis further provided that, "I went to see Omar, I approached him and could see that he was dying, since he was really fucked up." *Id*.

#### c. Other Witness Statements

The excerpts of several other witnesses' statements are included in the Mexican arrest warrant. The Court discusses those witnesses who observed key events.

Miguel Angel Yerena Vera witnessed the events and provided a statement. Dkt.

Case No. 16-xr-90095 NC            8

1   No. 52-9.  Mexico summarized his statement in the warrant.  BSN 69-70.  Miguel saw
2   Ramirez Luna holding the machete before and after Mauricio shot Rodolfo and Omar.
3   BSN 70.  Afterward, Miguel approached Omar, and found "he was still alive but he had
4   such a big injury in his neck and he was bleeding, there were some people near him . . .
5   when we saw he was still alive we tried to pick him up and get him in the truck to take him
6   to get medical attention . . . ."  *Id*.

Victor Alfonso Hernandez Ramirez, who also provided a statement, did not see the initial fight between Omar and Ramirez Luna, but did see when Mauricio and Ramirez Luna later returned armed.  BSN 73.  Victor saw Mauricio shoot Rodolfo and Omar.  BSN 74.  Victor also saw Ramirez Luna strike a still-alive Omar with the machete.  *Id*.  According to Victor, he did not approach Omar after the violence, and left the scene.  *Id*.

Ramirez Luna attempts to discredit all of the witness testimony presented.  The Court rejects that challenge.  As an extradition court, the Court may not make credibility determinations.  *Santos*, 830 F.3d at 993.  Though there are some inconsistencies in the testimonies of Pablo Murillo Ramirez and Luis Angel Garcia Sanchez, those inconsistencies are not so great, and they do not bear on the key contested facts: that Ramirez Luna struck Omar with the machete, and that Omar was still alive when this happened.  For example, even if the Court did not credit Luis Angel Garcia Sanchez's 2012 statement, in his 2009 statement, Luis specifically stated Omar was still alive and groaning after Ramirez Luna struck him with the machete.  Dkt. No. 52-2 at 4.  Luis described the same in his 2012 statement.  BSN 183.  This undermines Ramirez Luna's claim that Omar was already dead when Ramirez Luna struck him.

Even if the Court were to accept the challenges to Pablo and Luis' testimonies, which it does not, that still leaves the eyewitness testimony of Miguel Angel Yerena Vera and Victor Alfonso Hernandez Ramirez unchallenged.  Miguel saw Ramirez Luna holding the machete before and after the violence, and saw that Omar was still alive after being shot and struck with the machete.  Victor saw Ramirez Luna strike the still alive Omar with the machete.  These two eyewitness statements combined would support a probable

Case No. 16-xr-90095 NC    9

1    cause finding in this case. When combined with the overall consistent statements of Pablo

2    and Luis, there is significant overlap in the witnesses' accounts of the events.

### 2.   The Medical Expert Opinion on the Autopsy of Omar Garcia

Diana Cuevas Saldaña and Ubaldo De Jesus Aguilar Aguilera completed an autopsy of Omar Garcia on January 5, 2009. BSN 111. They identified eight wounds apparently from a firearm, a wound "with characteristics of those produced by a sharp weapon, lineal form, found in chin and right parotid-mastoidal areas," and wounds to his hands caused by a knife. BSN 113-14. The autopsy classified as lethal "EITHER SEPARATELY OR IN CONJUNCTION" Omar's injuries caused by a sharp-edged instrument penetrating his neck and those wounds produced by a firearm projectile penetrating his thorax and abdomen and double penetration in his thorax and abdomen. BSN 117 (caps in original). Cuevas Saldaña and Aguilar Aguilera found Omar's "immediate" cause of death was: "WOUND PRODUCED BY SHARP-EDGED INSTRUMENT AND WOUNDS OF PROJECTILES FIRED FROM A GUN WHICH PENETRATED THORAX AND ABDOMEN AND DOUBLE PENETRATION IN THORAX AND ABDOMEN." BSN 118 (caps in original).

### 3.   The Raven Report

In support of the motion to deny extradition, Ramirez Luna offered a report by forensic pathologist, Katherine Raven, M.D., which, according to Ramirez Luna, "clarifies certain ambiguities in the government's evidence."[2] Dkt. No. 52 at 11-12; Dkt. No. 52-7 (the Raven Report). Raven did not examine Omar Garcia's corpse, and she reviewed all of the exhibits attached to the extradition request except for the autopsy performed on Omar.

---

[2] Ramirez Luna also moves to admit into evidence an article entitled *Mexico's Deathly Data*, Stanford Magazine 28 (Nov./Dec. 2016), arguing that the Court "should apply particular scrutiny to all of the statements obtained by the Mexican authorities in light of the widespread corruption of law enforcement." Dkt. Nos. 52 at 13, 52-8. Essentially, Ramirez Luna asks the Court to distrust all evidence obtained from the Mexican government based on an article that discusses how criminal organizations in Mexico buy off the local and national authorities. First, such a sweeping request is poorly supported. Second, the article is irrelevant for purposes of this motion because no one alleges a criminal organization was in any way involved in Omar's murder. Lastly, this is an argument properly brought before the Secretary of State after certification.

Case No. 16-xr-90095 NC                    10

Raven Report at 1.  Specifically, the Raven Report observes that:

> Including all significant injuries in a cause of death is not an uncommon practice in cases where there are multiple modalities of injury are present [sic].  While many of the wounds can be independently fatal, the wounds are grouped collectively for purposes of a cause of death statement.  However, it should not be inferred from such a statement which injury was specifically fatal or the order in which the injuries were inflicted.

*Id*. at 2.  Thus, concludes Raven, she could not "determine [from the autopsy alone] if the sharp force injury truly contributed to" Omar's death.  *Id*.  She continued: "the gunshot wounds were clearly fatal as they injured the heart, lung, and liver . . . .  So, clearly, the gunshot injuries were truly independently fatal as they alone contributed to this internal collection of blood."  *Id*.  The Report gives reasons why the machete wounds were not the cause of Omar's death and how eyewitness accounts that Omar was still alive after the machete wounds were inflicted could be explained away.  *Id*.  Raven concludes: "it is my opinion that the cause of death can appropriately [be] certified as a consequence of multiple gunshot wounds."  *Id*.

However, Raven's description of the task assigned to her reveal the reason she was retained as an expert: "I was asked to specifically review the autopsy protocol and photographs pertaining to Mr. Omar Garcia to see if Mr. Garcia was still alive at the time the machete wound was inflicted."  *Id*.  Where the Mexican autopsy for Omar Garcia stated that his immediate cause of death was both the machete and gun wounds, BSN 47, 118; Ramirez Luna may not present contradictory evidence.  *Mainero*, 164 F.3d at 1207, n.7.  The Raven Report does not merely seek to explain away some of the government's evidence, it seeks to negate the specific finding of the cause of death.  *Id*.  As a result, the Raven Report is inadmissible in these proceedings.  *Id*.; *see also Santos*, 830 F.3d at 993.

Even if the Raven Report were considered in these extradition proceedings, it would not negate probable cause.  Raven concludes that Omar's cause of death "can be appropriately certified" as being caused by the gunshot wounds, but she also says, "I cannot determine if the sharp force injury truly contributed to" Omar's death.  Raven Report at 2.  There is no certainty to these findings, and Raven specifically notes that the

Case No. 16-xr-90095 NC            11

1  photographs of the scene and autopsy were of poor quality and minimal," and no "close-up
2  photographs of blood depositions at the scene were provided." *Id*. These admissions
3  undermine her conclusion that the gunshot wounds, and not the machete wounds, or a
4  combination thereof, caused Omar's death.

5      In addition, evidence presented to the court in support of extradition may be
6  contradictory, so long as competent evidence supports a finding of probable cause. *Sainez*,
7  588 F.3d at 718.  As stated above, the extradition judge must find probable cause to certify
8  the extradition, which requires the judge to determine if there is "'evidence sufficient to
9  cause a person of ordinary prudence and caution to conscientiously entertain a reasonable
10 belief in the accused's guilt.'" *In re Flores Ortiz*, 2011 WL 3441618, at *7.  The judge
11 makes no determination of guilt or innocence, because it is the demanding country that
12 will determine the accused's guilt. *Valencia*, 655 F.2d at 198.  Thus, the Court is not here
13 determining whether Ramirez Luna murdered Omar, it merely must find there is enough
14 evidence to "conscientiously entertain" the reasonable belief that Ramirez Luna committed
15 the crime. *In re Flores Ortiz*, 2011 WL 3441618, at *7.  This is not a trial.  The Court
16 finds the government crossed the evidentiary threshold; the combination of the witness
17 statements and the autopsy, which was performed on the body the day after Omar's death,
18 support a finding of probable cause that Israel Ramirez Luna committed the murder of
19 Omar Garcia.  Consequently, the Court CERTIFIES extradition and DENIES Ramirez
20 Luna's motion to deny extradition for lack of probable cause.

21 **IV.  CONCLUSION**

22     The Court DENIES the motion to deny extradition for lack of probable cause and
23 CERTIFIES to the United States Secretary of State that Israel Ramirez Luna has been
24 charged with the crime of aggravated homicide by the United Mexican States, that the
25 crime is an extraditable offense under the Mexico-United States Extradition Treaty, and
26 that probable cause has been presented to sustain the charge under the provisions of the
27 Treaty.

28     The Court acknowledges that at the February 22, 2017, hearing, the government

Case No. 16-xr-90095 NC           12

1  stated it would move to reconsider Ramirez Luna's detention if the Court certified the

2  extradition.  The government may now file a motion for reconsideration of detention with

3  the Court, if it elects to do so.

## CERTIFICATE OF EXTRADITABILITY

Based on the evidence presented in this case under 18 U.S.C. § 3184, the Court finds and orders as follows:

1. This Court has subject matter jurisdiction to conduct the extradition proceedings.

2. The Court has personal jurisdiction over Israel Ramirez Luna.

3. The Court is authorized to conduct the extradition proceeding under Criminal Local Rule 7-1(b)(13).

4. There exists a valid extradition treaty between the United Mexican States and the United States, and that treaty is in full force and effect.

5. The offense of aggravated homicide under Articles 140 and 153 of the State of Guanajuato's criminal code is an extraditable offense under the terms of the extradition treaty between Mexico and the United States, as well as being criminal under the laws in both Mexico and the United States and punishable by deprivation of liberty for a period of one year or more.

6. Mexico provided the documents and information required for extradition under Article 10(2) of the treaty: a statement of the facts of the case, the text of the legal provisions describing the elements of the offense and its punishment, the text of the legal provisions relating to the time limit for prosecution of the offense, and information about Ramirez Luna that permitted his identification.

7. Mexico also provided the information required under Article 10(3), as Ramirez Luna has not yet been convicted of aggravated homicide in Mexico.  As required under Article 10(3), Mexico provided a certified copy of the arrest warrant and sufficient evidence under United States law to justify Ramirez Luna's apprehension and commitment

Case No. 16-xr-90095 NC                 13

for trial if the offense had been committed in the United States. The Court finds probable cause to believe that Israel Ramirez Luna, the person whose extradition is sought, committed the offense of aggravated homicide under Articles 140 and 153 of the State of Guanajuato's criminal code.

The Court hereby certifies the above findings to the Secretary of State.

**IT IS SO ORDERED.**

Dated:  March 17, 2017                              _____
                                                                         NATHANAEL M. COUSINS
                                                                         United States Magistrate Judge